UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                                                                    CRIMINAL ACTION NO. 1:15-CR-23-GNS

CLAY SHELTON                                                                                DEFENDANT

**PRETRIAL MEMORANDUM**
*-Electronically Filed-*

Comes now the United States of America, by counsel, and submits the following pretrial memorandum, in compliance with the Scheduling Order.

**Statutes Involved and Elements of the Offenses**

    A.    Counts 1-3 (Wire Fraud)

The Defendant is charged in Count1 1-3 of the Second Superseding Indictment with wire fraud, in violation of Title 18, United States Code, Section 1343.  Chapter 10.02 of the Sixth Circuit Pattern Jury Instructions requires the government to prove the following elements beyond a reasonable doubt in order to establish a Title 18, Section 1343 offense:

    1.    The defendant knowingly participated in a scheme to defraud in order to obtain money or property, that is loans from First Southern National Bank and First Community Bank;

    2.    The scheme included a material misrepresentation or concealment of a material fact;

    3.    The defendant had the intent to defraud; and

    4.    The defendant caused another to use wire communications in interstate commerce in furtherance of the scheme.

B.     Counts 4-9 (Money Laundering)

The Defendant is charged in Count1 4--9 of the Second Superseding Indictment with wire fraud, in violation of Title 18, United States Code, Section 1957.  Chapter 10.02 of the Sixth Circuit Pattern Jury Instructions requires the government to prove the following elements beyond a reasonable doubt in order to establish a Title 18, Section 1957 offense:

First, that the defendant knowingly engaged or attempted to engage in a monetary transaction.  The parties, however, have stipulated to the following:  The transactions identified in Counts 4 through 9 were "monetary transactions" as defined in 18 U.S.C. § 1957(f)(1).  More particularly, the transactions specified in Counts 4 through 9 involved the deposit, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument as defined by 18 U.S.C. § 1956(c)(5) by, through, or to a financial intuition.  The defendant, however, denies that the transactions involved criminally derived property from a specified unlawful activity.

Second, that the monetary transaction was in property derived from specified unlawful activity.

Third, that the property had a value greater than $10,000.

Fourth, that the defendant knew that the transaction was in criminally derived property.

Fifth, that the monetary transaction took place within the United States.

C.     Counts 10-28 (Securities Fraud)

The Defendant is charged in Count1 10-28 of the Second Superseding Indictment with wire fraud, in violation of Title 15, United States Code, Section 78j(b).  Chapter 10.02 of the Sixth Circuit Pattern Jury Instructions requires the government to prove the following elements beyond a reasonable doubt in order to establish a Title 18, Section 78j(b) offense:

First, Defendant knowingly either employed any device, scheme, or artifice to defraud, or made any untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Or engaged in a transaction, practice, or course of business which operated or would operate as a fraud and deceit on any person

Second, Defendant did so in connection with the purchase or sale of the securities described in Counts 10 through 28 of the Second Superseding Indictment;

Third, In connection with this purchase or sale Defendant made use of or caused the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, and

Fourth, Defendant acted with the intent to defraud.

## Statement of Facts

The defendant owned and operated U.S. Energy Partners, Inc. (U.S. Energy) in Bowling Green, Kentucky.  U.S. Energy operated as the managing partner of oil and gas partnerships operated by the defendant in Kentucky and Tennessee.  The partners were investors solicited by the defendant.  Shelton worked in the oil and gas industry for many years prior to 2011.   The defendant also operated Escrow 2011 LP (Escrow 2011).  The defendant created The Monterey Pipeline Partners, Inc. purportedly to purchase the Monterey Pipeline gas pipeline in Tennessee.  The pipeline would connect oil and gas wells, including those owned by Shelton, in Kentucky and Tennessee.  Escrow 2011 was an investment partnership created by the defendant to fund an escrow account to purchase and operate the Monterey Pipeline.  The defendant also operated Brakaw Energy Management LLC (Brakaw).  Brakaw was purportedly created to manage and operate the Monterey Pipeline when he completed the purchase.  The Second Superseding

Indictment generally charges Shelton with fraud in his solicitation and use of the investment funds for the purchase of the Monterey Pipeline. Many of the investors into the Monterey Pipeline were previous investors in the defendant's other oil and gas ventures.

From March 2011 through September 2012, the defendant solicited $1,370,000 from eleven investors for the purchase of the Monterey Pipeline. Shelton's employees, including Aaron Grogan, did much of the solicitation. Shelton's employees will testify that they relayed the information and literature to investors provided to them by the defendant. Shelton fraudulently represented, or caused his employees to fraudulently represent, to the investors that their funds would be held in escrow as a down payment until he was able to obtain a loan to purchase the Monterey Pipeline. He fraudulently stated that he was preapproved for this loan. He provided investors with a Private Placement Memorandum (PPM) for Escrow 2011 in which he offered the investment into the partnership. The offering stated that $1,500,000 was needed as a 10% down payment for a $10 to $15 million loan from an unnamed financial intuition to purchase the Monterey Pipeline. The funds from the loan, according to representations by the defendant, were to purchase the existing pipeline for $2 million and the remainder was to develop and operate the pipeline.

It is not disputed that the Monterey Pipeline existed and that Shelton was interested in purchasing it. Shelton, however, made a series of false representations to investors. He also misappropriated investor money in a variety of ways that are explained in further detail below. Each investor was promised that they would receive their investment back as soon as the funding from the financial institution was completed. The defendant stated to the investors that the loan would be closed in 30 to 60 days and in the interim the funds would be held in escrow. He falsely stated to the investors that the loan was pre-approved; all he had to do was raise was raised the

10% down payment. Once the loan closed, investors would receive either a 25 percent return on their investment or Monterey Pipeline would buy their interest in any Tennessee well program they previously purchased through U.S. Energy Partners. Investors were assured they would receive at least their investment back in in short order if the loan was not funded. The defendant repeatedly told each investor that their money would be deposited in an escrow account and that their money would never leave the escrow account. He characterized this as a "no risk" investment because of the escrow account.

The defendant received $1,370,000 from 11 investors from March 2011 through September 2012 that was purportedly intended for Escrow 2011 and the purchase of the Monterey Pipeline. The defendant deposited $1,125,000 into the Escrow 2011 bank account at American Bank & Trust (A.B.&T.). The remaining $245,000 was deposited into the Monterey Pipeline Partners LLC bank account at A.B.&T. Shelton ultimately transferred approximately half of the investor money to operating accounts of his other businesses. He lost approximately the other half in a risky investment with J. Mac Rust. The investor funds were never supposed to leave the Escrow 2011 bank account until the loan for the Monterey Pipeline completed. The risky investment involved the defendant wiring $1 million of investor funds to Rust in August and September of 2011. Rust was then to invest the $1 million in collateralized mortgage obligations. The defendant lost $575,000 of the money he wired to Rust.

On December 15, 2011, Rust transferred $425,000 of the original $1 million back to the defendant. The defendant then transferred the majority of these funds into operating accounts of his other businesses. He did, however, use $125,000 of these funds to pay back Escrow 2011 investors A.&M.T. and C.S. The remaining $300,000 was not placed in escrow or returned to investors. In September 2012 the defendant also solicited an additional investment from

5

A.&.M.T., who was previously repaid on his first investment, under the same false pretenses involving Escrow 2011 and the Monterey Pipeline.

Investors are also expected to testify that the defendant told them a number of false excuses even after their initial investment, to include blaming the problems on a fire that destroyed his U.S. Energy building on September 12, 2012. However, by the time the fire occurred in September of 2012, Shelton already misappropriated the vast majority of investor funds. From 2012 through 2014 he repeatedly told investors that financing for the Monterey Pipeline was imminent. This was, in fact, not true because as of September 2012 all investor money was long gone from bank accounts controlled by Shelton. In fact, by early 2012 the majority of the investor money was gone from Shelton's bank accounts.

Each of the investments constitutes a wire fraud because interstate wire communications were involved and false representations were made. Each of the investments also constitutes securities fraud because the investments meet the definition of a security and he made false statements during their solicitation. Finally, many of the transfers of funds involved money laundering because the transfers involved the specified unlawful activity of wire fraud.

## Substantive Issues of Law

A. Stipulations

The parties have agree to the following stipulations that will be filed with the Court:

1. The defendant made or caused to be made interstate wire communications, i.e. interstate wire transfers, as alleged in Counts 1 through 3 of the Second Superseding Indictment. He, however denies that said communications were made for the purpose of executing any scheme to obtain money by false representations, pretenses, or promises, as alleged in Counts 1 through 3. All of the wire communications identified in Counts 1 through 3 were either sent from or received in the Western District of Kentucky and traveled in interstate commerce.

    2.       The transactions identified in Counts 4 through 9 were "monetary transactions" as defined in 18 U.S.C. § 1957(f)(1).  More particularly, the transactions specified in Counts 4 through 9 involved the deposit, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument as defined by 18 U.S.C. § 1956(c)(5) by, through, or to a financial intuition.  The defendant, however, denies that the transactions involved criminal derived property from a specified unlawful activity.

    B.       Securities evidence

The United States will present the potential expert testimony evidence from Jesse Vaughn from the Enforcement Branch of the Kentucky Division of Securities.  Mr. Vaughn's office is the Kentucky agency regulating securities.   The United States previously provided expert notice of Mr. Vaughn's testimony.  He will testify that the general nature and offering documents involving Monterey Pipeline and Escrow 2011 constitute a "security" that would be required to be registered with registered with the Commonwealth of Kentucky or the Securities and Exchange Commission.   In the course of his testimony, he will also testify and present records demonstrating that the defendant and his businesses previously registered securities with the Commonwealth of Kentucky and the Securities and Exchange Commission.   This evidence is necessary to prove the elements of securities fraud as charged in counts 10 through 28 of the Second Superseding Indictment.  The United States is not presenting evidence of any previous securities fraud, but, rather, is establishing that the defendant is experienced in the securities industry.

## Evidentiary Issues

    A.       Statements of defendant's agent/employee

The United States may introduce statements of the defendant's then-employee Aaron Grogan.  Grogan worked as a salesman for Shelton and worked to solicit investors for Escrow 2011.  The investors will testify that Grogan made a number of representations and statements to them regarding the substance of Escrow 2011.  The United States will seek to introduce

7

Grogan's statements to these investors/victims through their testimony. These statements are non-hearsay by definition because they are an opposing party's statement made by the party's agent or employee on a matter within the scope of that relationship and while it existed. Fed.R.Evid. 801(b)(c). Therefore, any statement Grogan made to a potential investor is non-hearsay because he was working as an agent for the defendant. Mr. Grogan will also be available to testify at trial and it is expected he will verify making these statements.

B. Defendant's statements to others

The United States intends to introduce various statements made by defendant Clay Shelton to law others in its case chief. The United States anticipates that the defendant may try to introduce other self-serving statements he made to others, over and above the statements introduced by the United States, as well as statements made to other individuals that should be inadmissible when offered for the truth of the matter asserted.

The defendant's self-serving statements to others when offered for the truth of the matter asserted, are inadmissible hearsay. Under the Federal Rules of Evidence, such statements do not fall under any definition of non-hearsay or under any hearsay exception. *See United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014); *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) ("Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses."); *United States. v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("Admissions by a party-opponent are not considered hearsay and therefore can be admitted against that party... [T]he rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party.").

Further, the statements are not admissible under the "rule of completeness." The rule of completeness may "allow a party to correct a misleading impression created by the introduction of part of a writing or conversation by introducing additional parts of it necessary to put the admitted portions in proper context." *United States v. Parenteau*, 529 Fed. Appx. 532, 535 (6th Cir. 2013) (unpublished) (*citing United States v. Henderson*, 626 F.3d 326, 344 (6th Cir. 2010)). However, the rule of completeness only addresses an order of proof problem, enabling a party to present context at the time evidence is introduced rather than later in trial. The Sixth Circuit has explicitly found that the rule of completeness "is not designed to make something admissible that should be excluded." *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982). In fact, the rule of completeness "does not outweigh the hearsay rules . . . [and] exculpatory hearsay may not come in solely on the basis of completeness." *United States v. Shaver*, 89 Fed. Appx. 529, *3 (6th Cir. 2004); *see also United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013) (*citing Costner* and affirming district court decision to exclude defendants' attempts to introduce their own allegedly exculpatory statements); *Parenteau* at 535 (the rule of completeness "does not allow a party to admit evidence that is otherwise inadmissible").

C.  Fire at Shelton's business

The ATF and local fire officials investigated a September 12, 2012, fire at the defendant's business. Shelton was not charged with arson and the United States does not intend to present any evidence of arson. Some of the witnesses, however, may testify that Shelton told them that the reason he could not repay their investment in Escrow 2011 and the Monterey Pipeline was because his office and records were destroyed in this fire. The United States intends to present this testimony from witnesses without going into any detail about the actual fire. Generally, the investor money was long gone by the time the fire occurred on September 12, 2012. The United

9

States will also present the defendant's testimony from his Examination Under Oath by his insurance company. The examination was taken as a result of his insurance claim from the fire. The United States will present, in the form of a transcript and court reporter, excerpts from his Examination Under Oath in which he discussed Escrow 2011 and the Monterey Pipeline. None of the excerpts pertains to the fire or the cause of the fire.

Instructions and Proposed Voir Dire Questions

Proposed jury instructions and voir dire questions are attached.

Respectfully submitted,

RUSSELL M. COLEMAN
United States Attorney

*/s/ Bryan R. Calhoun*
Bryan R. Calhoun
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 625-7064
(502) 582-5097 (Fax)

**Certificate of Service**

I hereby certify that a copy of the foregoing was sent by electronic transmission through the Court's ECF system to defense counsel on January 2, 2018.

*/s/ Bryan R. Calhoun*
Bryan R. Calhoun
Assistant United States Attorney